Good morning, Your Honors. May it please the Court, my name is John Stickman and I'm here on behalf of the petitioners, Turlock Irrigation District and Modesto Irrigation District, two consumer-owned utilities located right here in Central California. I would like to reserve two minutes for rebuttal. At issue in this case is whether or not the Federal Energy Regulatory Commission properly interpreted the notice and study requirements of the district's interconnection agreements with Pacific Gas and Electric when it refused to require PG&E to participate in a study to determine if PG&E's modifications to the remedial action scheme would cause adverse impacts on the district's systems. FERC's orders in this case should be reversed and not afforded any deference for at least the following reasons. First, FERC applies the wrong threshold for invoking a study under the interconnection agreements. FERC has the agreements to include a will or will likely requirement before a study can be invoked. However, on their face, the agreements indicate that the standard is may or may reasonably. FERC's use of this higher threshold for invoking a study disregards the plain meaning of the actual threshold in the agreements and fails to construe the contract as a whole because it puts the districts in the untenable position of needing to show an adverse impact before they can get a study that would demonstrate the same. It creates essentially a catch-22. Second, the unreasonable, the FERC orders unreasonably rely on PG&E's unilateral analysis and the ISO's unsanctioned study. In the agreements, section 9.11.1b and 9.11.2 expressly indicate that studies can only be conducted by either mutually agreed upon third party or if the parties are unable to agree on a third party, they're required to conduct the study on a joint basis. Can I ask you a threshold question? So the definition of adverse impact has the phrase materially degrades reliability. It seemed to me that perhaps the parties are using different definitions of reliability here and that that might be part of the disconnect. Could you tell me what you mean by reliability? Sure. It's the ability to maintain the balance in the system. So in the energy world, you balance loads and resources and when you're unable to access generation, for example, because you're not able to use a supply line like is the instance here, that being the California-Oregon transmission project, the single largest interconnection to the district's resources in the Pacific Northwest, it makes it difficult for you to meet your load and reserve requirements, i.e. it makes it difficult to balance your resources. So I think your answer, if I understood it, is that reliability for you is about having access to all the supplies of power that you want? It's access to the Northwest Power Pool in particular because the Northwest Power Pool is an entity that we share reserves with and by sharing those reserves, that's how we meet our reliability needs. So it seemed like PG&E was talking about reliability being about operating within certain thermal and voltage limits, and they seem to take this from a NERC definition, and that seemed much more about the physical operation of the line, like do you have physical parts of the line that are impeding the flow of power? That seems different to me than your definition, which seems to be just about more like access to the people you have contracts with, not the physical line. Do you agree with my assessment of the difference in how you're defining this? I think PG&E is trying to take a hyper-technical view of it because it benefits their position. However, in the past, they haven't taken that position and they've looked at the contract as a whole and what its overall purpose is, which is to maintain the reliability of each of the interconnected systems. So if we were to define reliability, though, in this physical way that it has to do with whether power can actually physically get through the line, do you admit that there is no impact on that here? No. In fact, the reference to transmission constraints is a reduction in the physical ability of power to actually be transmitted over the line. So there is that issue, and that's why both PG&E and FERC have conceded that in these circumstances, when there is a reduction, that can affect reliability. In fact... It actually affects the thermal and voltage limits of the line? Yes. How does it do that? So if you're not able to maintain access to those resources, your reliability can go down, the frequency of your system can go down, and it can cause thermal overloads, it can cause a variety of problems with your system. So, like I say, the focus on whether or not the details of our system can operate in a particular fashion is myopic. I think you have to look at what is the purpose of this, and you have to look at why, in the agreement, the definition of long-term change to operations includes a reference to a modification of the RAS, the Remedial Action Scheme, because that is exactly the circumstances that have occurred here, and that is exactly the type of event, the reliability event, that we would try to prevent from occurring. Does the adverse impact under 4.2, that definition, require it to be a material effect on your client's system, as opposed to the broader California-Oregon system? Correct. So it does, and we've demonstrated that those impacts are directly to us. In your mind, think about it, while a person's body can digest food, if they've been separated and put in a room where they can't access any nourishment, then what will happen? They'll die, right? And that's really what's happening here. They're taking the hyper-technical view of saying, well, you can still digest food, we don't give you access to it, but, you know, and... But I thought your answer, so I'd like to go back to your answer a moment ago, because I thought you said, I thought you were going to say this, that you still can digest food, we just don't have the food. But a moment ago, I thought you were starting to say, actually, lacking the food causes me to not be able to digest the food. So there's two elements to it. If we're not able to access the COTP, and we're not able to meet our load, because in the Pacific Northwest, 35% of the load, the 35% of the district's load. So if they're not able to access that, then physically, their ability to operate their system and maintain the reliability of their system is affected. In some way other than having enough food, having enough power. In some way, actually, it affects the digestion, on your analogy. Correct. If we, if the limits go low enough, if we're in a situation where that line is completely cut off, then if that happens, then we're not able to operate our systems, there could be blackouts, etc. And that's really why we're here. But that wouldn't necessarily, you can pass out from lack of food, that doesn't mean you can't digest. I'd like to see if you really have evidence that something happens to the ability of the lines to carry the power when you lose some of the supply. Yes, if you look in the brief, we reference Mr. Sawyer's evidence where there was an event in the past where there was an outage on the COTP, and because of that Sawyer affidavit, paragraphs 26 to 30, in that instance, in those circumstances in the past, there was a reduction in the California-Oregon transmission project, so there was no access to that particular line. When that occurred, it resulted in Modesto Irrigation District having to scramble to maintain the operations and manifestations that required electricity from elsewhere. They scrambled, and because it was during an off-season, i.e. not in the summer when demand is high, they were able to avoid a situation where they had outages. So in your mind's eye, I think the best way to think of the relationship is, if you lose that access, even though you can digest, you can only sit in that room for so long before it affects you, and that's really what's going on. Now what we see in the electric world is loads and resources are balanced in real time. Electricity moves at the speed of light. So when you have a situation where that reduction goes on long enough, then what happens is you have a situation where the system itself gets sick. The system itself cannot maintain the reliability that is needed. So the only option is blackouts. And that's why we're here. That's why we spent so much time and resources on this case, because we need a study that determines once and for all what happens when we lose access to the COTP. Well, what Mr. Saylor, your declaration says, paragraph 26 in part, is that the restrictions may impair MID's ability to rely on operating reserves. Is that enough to fire a study? Yes, Your Honor. It is because the standard is may result or may reasonably result. And why that matters so very much in these circumstances is the reason why that may was put in there, and it was specifically and purposely put in there, is because... It's not the contract language. It is? Yeah. It is, but also, Your Honor, yeah, it's there, but it's also, this is important. MID was able to get out of the mess during those circumstances because it was a time... Mild winter. I'm sorry? Mild winter. It was a mild winter, correct. But if that wasn't the case, then it would be a different situation. I'm looking at these paragraphs 26 to 30 that you cited, and it sounds to me just like they're talking about a reduction on your analogy of sources of food. I don't see anything here. Can you point me to something in these paragraphs that says that the lines started to not work because they, other than just there was less supply coming into them? So when the, what he says is they had to scramble... To get other sources, like wind. I don't understand how that's not just about other sources of food. Right, so, but again, it's an issue of if you go long enough without those other sources of food, what happens to the system? But I'm asking you where the evidence of that is. I mean, you're saying that to us, but I think there needs to be some evidence that actually, if their definition of reliability is right, that some, some evidence somewhere that there might be a problem with the actual transmission along the lines, the physical ability to do that, and you're saying that these paragraphs are evidence that there is, but I don't see it in those paragraphs. So, so number one, I, just to be clear, what I was trying to say is that our view of it is exactly what I said, which is if you don't have access, you can't maintain the reliability of your system. It's just that simple. So you do dispute their definition of reliability. But what happens is over time, and, and, and what Mr. Sawyer's references were to getting more resources, the whole intent there is if you don't, if you're stuck where you, you can't get that vital supply of food, then what happens? The system goes down. It shuts down. Well, sure, because there's no supply, but that doesn't mean there's something wrong with the physical ability once the supply is there. It doesn't break the line. The line doesn't melt, and now it won't, we'd be able to work later. Well, it, it depends on the circumstances. So it's possible that you could have overloads, you could have physical events that occur on the line. But I mean, that's not discussed in paragraphs 26 to 30. Right. So, so in those circumstances, the, the, the physical impact is you're having to cut load. You're having to black out the system. Yeah, you can't, you can't, your, your argument is you can't balance the load in real time, and you come up with shortages and blackouts. Exactly. I don't think, I don't think you're arguing that in this particular instance that there's a physical damage to the line that occurs. It's just a matter of load balancing, right? Correct. But to, to answer your Honor's question, if it goes on long enough, there could be physical impacts too. That, that's, I hope that I really, I'm trying to... But, but it seems like, I mean, maybe back to my first question, then. It seems like you are relying on a definition of reliability that has to do with enough sources of power coming in that you can keep the power going. And they seem to be arguing that a definition of reliability is the actual physical ability of the line. And those are different definitions of reliability. So if I'm right about that, then I'd like to know where, what the support is for your definition of reliability. So with regard to, you know, the view that we need access because without access, you know, you can't balance, that's specifically why the remedial action scheme is referenced. Because the remedial action scheme, as far as the districts are concerned, has only one sole purpose. And that is to protect the California-Oregon Transmission Project and maintain its operating limits. And if you look in paragraph 26 of the answer of the Federal Energy Regulatory Commission, they acknowledge that by maintaining the, the transport capability on the COTP, that you maintain reliability of the district system. They acknowledge that and we pointed that out in our brief. So that's really, you know, Is there a, is there a case or a regulatory definition or something of reliability that I can look at that matches the way you seem to be using it? Well, if you're not able to maintain voltage, you have blackouts. So that's why this idea of maintaining voltage on your system, you require a source. I mean, that certainly seems like a possible definition of reliability, but they seem to have a different one. So I'm trying to figure out how are we supposed to choose, or should we defer to the agency to choose? So I believe you have to look at the broader context and purpose of the contract. And you have to ask yourself, what were they trying to protect here? And I think what they were trying to protect is their access, at least with regard to the references to the Medio Action Scheme, their access over the California-Oregon Transmission Project. Judge Zillio has a question. I want to change focus for just a moment. I think time is out. But the, the, the, the commissions, both the order and the order denying rehearing, both referred to, and I want to read from the first order, the record demonstrates that a study of the potential impacts on their jointly owned facilities was not necessary. And, and that's what they say in the order. That's what they say in the order denying the rehearing, again, at paragraph 36. And they're referring basically to your complaint, which seems to suggest that based on the information you had been given, you did not request a study. Now, is the commission wrong in what they're saying? Absolutely. And I think this. Help us understand that. Yeah, thank you for pointing that out. What they're referring to is a low, no overloads on the Los Banos-Wesley line. Well, isn't that your line? It isn't. It's actually a PG&E facility. And why that matters is because it's, that's one of the interconnections with PG&E. And the, the view or the position that FERC has taken is, well, if there's no overloads on that set of facilities that, by the way, are not the district's facilities, then there is, there is no impact on your system. Is that between the California-Oregon system and yours? It's, it's one of the sets of facilities that interconnects our system to PG&E's system at a substation where other facilities interconnect as well. Right. But the commission seemed to rely on that heavily in its, both of its orders. You're saying it was not appropriate to do so? It wasn't in our brief. We, we, we refer to that as a myopic view because it would be irrational to say that a set of facilities that aren't on your system, that we've conceded have nothing to do with the, with the remedial action scheme and never have, would somehow be affected by an overload on the COTP. The references to the remedial action scheme in the contracts, again, has only one purpose, and that's to protect the California-Oregon transmission project. And by reading out of that, reading that protection out of the contract, we lose one of the fundamental purposes, purposes of this agreement. Without, without that protection, the agreement really provides very little for us. Thank you, counsel. Thank you. We'll give you some time for a Q&A. Good morning. I'm Carol Banta for the Commission, and I've agreed to share three minutes of my time with Ms. Kuh for PG&E. I, I think the core of this case actually goes to Judge Friedland's questions, but I want to clear up a couple getting to that. Also, just for clearing up any confusion about the lines, there's a very helpful diagram in the addendum, or in the excerpts of records, sorry, at PER 170. I think it was an attachment to PG&E's answer in the proceeding below. If the Court doesn't have, I don't know, if you don't have color copies of it, I brought extra color copies. No, why don't you bring those up? Okay. Just get them to clear. And do you have one for counsel, too? I may even have that. Just because the color coding helps show which lines are which. And to answer Judge Zille's question about there's a thin blue line at the bottom here, which is the Las Benas to Wesley, which is the PG&E line. The commission, the complaint by the districts focused entirely on the California-Oregon transmission project. But in the record, there had been earlier discussion among the parties about also whether there might be problems with this little blue line, the Las Benas-Wesley line. And over, whether reprogramming the remedial action scheme, which actually has to do a lot with PG&E's entire grid. It's not solely about the California-Oregon line. Whether reprogramming these thick blue lines or contingencies involving things would affect these thick blue lines that go from Tesla and Tracy to Las Benas, whether that could create some kind of overload situation. Anyway, PG&E was able to show to the districts that the existing remedial action scheme hadn't relied on those thick blue lines for other things so that it wasn't going to implicate their interconnection on the Las Benas-Wesley line. And the districts agreed with that. So the only reason that's relevant to this proceeding is after we get past the question, which I'll get to about the California-Oregon line, PG&E came in with evidence that, not so much rebutting that because as the commission found, the districts hadn't made the showing they needed to make there. PG&E came in and said, in addition, here's everything that we looked at about reprogramming the remedial action scheme and anything that could possibly be an adverse impact. And the only thing we came up with was this Las Benas-Wesley line. We talked about them. They conceded it. So it's not at issue here. So that's the reason PG&E was focusing on that. It was putting in its evidence, which the commission didn't have to go that far. It could have denied the commission cares about reliability and wanted to consider all the evidence. Are there any other effects we need to be concerned about? But going to the core of this case is Judge Friedland's question, and I think Judge Thomas as well, about the definition of reliability that the commission is using. And I would point the Court especially to paragraph 34 in the rehearing order. It's at PER 17, where the commission says, we recognize the significance of import capability over these facilities and the associated benefits. I won't read the whole thing. It says these operational aspects are separate from reliability impacts. Now, I know it doesn't flesh it out more there, but this is a concept that the commission has used in many orders, and perhaps the most relevant ones are the transmission agency orders that were affirmed by the D.C. Circuit. The complaint order, and I have that cited if you need it, it is cited in our brief, at paragraph 68, 69, talks about this same concept. And there's a rehearing order we may not have cited, but it's the rehearing order of the same thing. It's 150, FERC, paragraph 61, 133. At paragraph 55 of that order, it says in very similar language, a operational flexibility and reliability impacts. Now, there's no question that operational flexibility, which is your ability to schedule your reserves or bring in your energy from where you want to, where you purchased it, your ability to use these contract rights on the California-Oregon line, the commission doesn't downplay the importance of that. And in the transmission agency orders, repeatedly said to the parties, work together to figure out how to make this work for everyone. This is important. But the question before the commission in this proceeding is whether PG&E had breached its interconnection agreement with the districts in such a way that it should be responsible. Because this isn't just about a study. If you look at the complaint... Right, but when you're talking about the definition of reliability, you would agree that we're not simply talking about the physical capability of the system, wouldn't you? We're talking about the delivery of energy. Yes. And the commission, in this distinction between the operational aspects and the reliability, I think it really is looking at the thermal voltage kind of concept. But you're talking about what's going through the line, not necessarily the physical damage to the system. Well, if you look at, for instance, what the remedial action scheme does, it is programmed if a generator drops out, it has to make up for that somewhere else to get the energy flowing. So for instance, after the reprogramming of the remedial action scheme, the California Independent System Operator, which is the path operator for the California-Oregon line, concluded, and I think this finding is actually in the transmission agency orders, although it's referenced in paragraph 34. The system operator concluded that the reliability is maintained on the California-Oregon line. So it's not going to – And so what definition – I'm completely confused now. I thought you were going to say no, but you said yes. So what definition of reliability are you using? Oh, that it's not going to overload and go out of service. It's not going to overheat. In other words, you're agreeing with them that a blackout, for example, would be – that would be unreliable. Well, the commission sometimes refers to that as reliability, but it is operational. It is dropping your load. It's not because the line went out of service or overheated or a switch tripped somewhere. It's because – so again, it is something the commission is concerned about, but the question is, is it on PG&E under the interconnection agreement to deal with that? So I understand you to be saying, I think now, that reliability for purposes of this agreement and what PG&E is responsible for is just the physical line and not the contractual sources of power. Is that what you're saying? That's what the commission said. In paragraph 34, where it distinguishes between operational aspects, which is the scheduling of reserves from the Northwest rather than somewhere locally, where you find the reserves if you're curtailed because of – because the California-Oregon line is, since we're using different analogies today, essentially overbooked. It's not that it's out of service. It's not that it's overheating. It's that – It can't deliver. Hmm? It can't deliver. Well, it can deliver power, but the contractual rights of the parties require an allocation of it, and I would look for that at paragraph 27 of the rehearing order, which is at PER 14, where the commission said that the district's complaint focuses heavily on potential impacts on the California-Oregon line. And a few sentences later, it talks about the allocation of transmission capacity on that facility is governed by the district's membership in the transmission agency and the rights and obligations under the operation agreement. Those rights aren't considered part of the district systems as defined in the interconnection agreements. So just to step back – So it seems like they're saying, this is going to maybe cause us to pay a lot of money for wind power because we're not going to be able to get the California-Oregon line. And I think you're saying that's not PG&E's problem because that's not reliability within the meaning of the contract. Now, is that right so far? Yes. Again, not to say the commission doesn't care about that, but in interpreting this contract, is it PG&E's responsibility? Okay. So if that's what you're saying, then how do we know that from what FERC said? I mean, are we supposed to just – is this like everyone is just supposed to know that that's what FERC means when it says reliability? Because it seems like they didn't know that that's what you meant. And I don't know how we affirm the agency if we can't really tell from the face of it. It could be fleshed out more, yes. That's why I look to paragraph 34 where the commission does make a distinction, tying back to 27, when it says operational characteristics. It is talking about your ability to schedule the power you want, the power that you already have under contract, as opposed to finding power that you need right now, which might be more expensive if you're – that's operational. Again, it matters, but it's not what's at issue here. So I look at paragraph 34, and again, I look at – I even search for the words. And in the transmission agency orders, the commission relied on the same distinction. And it has made that distinction in, I think, dozens of orders. And it doesn't always necessarily flesh it out, unfortunately. Was this a summary disposition by the commission? No, it's a summary on – no, it's a disposition on the papers. We don't always order a trial-type hearing. So in the world that I normally live in, which does not include this, we talk about summary judgments, and we talk about whether there is any evidence to support the non-moving party. Is that what essentially – I think you have a summary disposition rule 217 that kind of picks that up? We do. Is that where we are in this proceeding? I think the commission – I think it's very similar. I think that commission – I see that more often in – Pacific Gas and Electric Company case versus the federal energy regulatory – that case talks about this rule and says that in a summary disposition, FERC has held that there can be no disputed issues of material fact. Do you concede that that's the burden that you have to have us affirm the commission's rulings? Well, the commission didn't treat it as a summary disposition. But I think that – Well, they didn't have a hearing, did they? Right. But they – when they take the evidence – I mean, they didn't decide it on the complaint. They looked at the testimony that the various parties put in. But they – their rulings seem a little bit – in one place, they say at PERC 38, the record reflects no evidence to support a likelihood of impact. And the page before they say the districts offer scant information regarding the effects. Now, they did provide some declarations to challenge the effect, did they not? Well, going – We got the Gilbertson affidavit, which said that the modifications are likely to cause significant reductions, which in turn will materially degrade reliability. Well, what the commission said – and I'm going again, I think, to paragraph 27, among others – is that, yes, the districts put in evidence, but all of their evidence went to the California-Oregon Transmission Project. And none of it explained how it was going to affect the physical aspects, the reliability within the district systems. But that ignores the Gilbertson affidavit, does it not? No, because all of that is very much focused on what the reprogramming of the remedial scheme could do to the California-Oregon line, and what that in turn could do to the district's operational ability to use their contractual rights to access certain reserves. I think a different definition of reliability than you were using. That's right. And so when PG&E came in with its evidence talking about the Las Banas-Wesley line, the commission also looked at that just as contrary evidence, just suggesting that the one potential impact had been addressed to everyone's satisfaction, apparently. And I do want to leave time for my intervener, but I hesitate to go with the digestion analogy because I didn't understand all of it myself. But the commission agreed with PG&E and not contested by the districts that food would still be coming in from the Las Banas-Wesley. It might not be the food that you already contracted for in the Northwest, but that food is still coming into the system, is how I'd put that. And I'll leave the rest of the time for my intervener. Thank you. Thank you, Your Honors. Why don't you put three minutes on the clock so she has her full three minutes. Thank you. Again, Your Honors, my name is Alyssa Kuh. I'm representing the Intervener Pacific Gas and Electric Company. To go back to a couple points, and sorry, I'm getting over a cold. You had actually asked about our definition of reliability, and we did take it from the NARC standards. It is also the definition set forth in the Federal Power Act Section 215, that's 16 U.S.C. 824.0, which explicitly gives FERC authority over maintaining the reliability of the grid. To go to this colored chart, PER 170, the problem with the district's argument is the impacts that they're talking about are on the kind of tan-colored line on the left-hand side. But the interconnection agreements only protect the reliability of the little red lines down at the bottom. And as this chart shows, there are many lines that feed into those little red lines. So to take the food digestion analogy, it's like you want a hamburger and you want to order it from McDonald's, and maybe there's a problem getting it from McDonald's. I agree, I would never want it from McDonald's. There's a problem getting... And just go back to power. There's a problem getting it from McDonald's, but you can order it from Burger King, you can order it from Carl's Jr., and that's what this chart shows. And all I say is, hey, we'd like a study to sort out all this stuff. It may end up that PG&E doesn't have to do anything. We'd just like a study. Well, and the way that FERC analyzed this is that there is no reasonable belief, no way you could have a reasonable belief that the impacts of the COTP would actually have an effect on the reliability of the district system, which is what is protected in the interconnection agreements. And to say that because they can't use a particular contractual arrangement would make PG&E have to guarantee any contractual arrangement they have, whether we know about it or not, on any lines outside of their system, and that goes way beyond what the interconnection agreements provide. Good points for the study. So, well... I mean, we dealt with it on a summary basis here on affidavits, and the threshold to me seems to be pretty low. It just may have an impact. And you say, well, that can't be. And you may be right. But we're not talking about the ultimate conclusion here. We're just talking about their right to get a study. Well, and actually, Your Honour, if PG&E had performed a study, as shown in the testimony of PG&E's witness, Anupama Pandey, the type of study that is called for when you are evaluating the reliability of the system would not have shown any impacts, because you don't look at what the contractual arrangements are. You look at the physical nature of the grid. And so it would not have... And I can find you the citation in my notes. Um... It is at PER 214 to 215, when Ms. Pandey describes what the study would comprise and how you would perform the study. So it seems like it's a small thing to have PG&E perform a study, but it is time-consuming. It's a use of resources, and if there's no reasonable basis to think that the impact would actually... I mean, that the effect on the COTP would actually have an effect on the district systems, it is not an efficient use of resources. But in the contract, you have... or the interconnection agreement, you have adverse impact defined as affecting the system or physical transfer. So arguably, when they talk about physical operation of the system, they're within the bounds of asking for the study. I mean, it's... I cannot read this language and say that that absolutely is prohibited by... prohibits consideration of perhaps balancing the grid or getting other contracts. The problem is... excuse me. The problem is, Your Honor, the physical operation of the grid is still the same as it was. They may not be able to bring power down on this one transmission line, but that's a contractual arrangement. They can bring power in some other way. There are numerous lines that come and interconnect with their system. That is not... Where does it say that in the agreement, though? That's where I... I understand your argument and why it doesn't matter, but the agreement doesn't seem to say that. It just says it's gonna have an adverse impact either on their operations or the physical line. It is a commonly understood term within the industry, and that's why FERC was applying its special... specialized expertise in interpreting what reliability means. So I think the chief is asking a good question, though, here about the definition of adverse impact in the contract. Why is there a one or two? Because it seems like the definition you're giving us today of reliability would make one and two say the same thing. There are other ways you can impact reliability other than the transfer of power into, out of, or within the system. There could be voltage support issues or there could be... I'm actually not a technical expert, so I can't think of too many right now, but there are other ways to impact reliability. So you're saying with this materially degrades reliability and then materially reduces the ability to transfer power in and out, those are both not about the contracts. They're both about something physical about the lines, and somehow they wrote them separately. Yes, the point of the interconnection agreements is to maintain the coordinated operation of the grids, of the districts interconnected with PG&E. We don't talk about contractual arrangements of where you get power. This is meant to preserve the operation of the grid, making sure, for example, you don't add a new generator that would cause voltage collapse on the other system. It's not up to us to know where they get their power from so as long as they are still able to transfer power into their system, that is protected under the interconnection agreement. Any further questions? Thank you. I'll give you three minutes to rebuttal. Thank you, Your Honors. I think you are spot on. Let's start with the map. The concept that there are other lines that interconnect to our system does not in any way demonstrate that somehow there are going to be impacts. There's a presupposition there that we have transmission rights and that we can use these lines and all those things which you didn't hear any of that. And the reason you didn't hear any of that is because no study has been done. How you figure that out is you do a study. Just that simple. So they point to this evidence that the contracts would not be Absolutely. If you take their interpretation of the contract, they interpret out completely the reference to remedial action scheme as the very first definition to a long-term change to operations that can trigger the study. With their definition, what happens under the circumstances when you have a reduction on the COTP? What you have is, again, the inability to balance your load and resources. So the reference to the remedial action scheme, as far as the districts are concerned, is it has only one purpose, and that is to protect the COTP. So it's disingenuous to all of a sudden say that there are these contractual obligations and we had no idea about the COTP. Well, the reference to the remedial action scheme it's undisputed. That reference has one purpose for the districts, and that's to protect the  That's it. So once we lose those protections, we lose the essence of this contract, at least as to that particular provision. Let's talk about coordinated operations. That word has been thrown around quite a bit, and I think Your Honor went right to the heart of that, which is, you know, if our systems go down because of their actions, we can't coordinate our operations. There is no ability to coordinate operations if we don't have access to a vital supply line that we rely on. It just doesn't make sense. It's just irrational. All of this can be sorted out with a simple study. And if we're wrong, and we use a third party, we pay three quarters of the cost. So I don't know what PG&E is afraid of. You know, we have to ask. They're the ones with all the data and information about their system. They refuse to provide it to us, so we can't even do our own study. But it seems like you guys are like ships passing in the night. I mean, what you think the study is going to look at is different than what they say the study is going to look at. So do we need to resolve that here today? Absolutely not. Who resolves what you meant when you entered this contract? So let's just assume this gets reversed and a study is ordered. What would happen is that we would either jointly agree or we would get a third party. If there's a dispute as to what is required in the study, there's a very detailed process as to dispute resolution regarding studies. So this court doesn't have to touch on that at all. But it like fundamentally starts with what you meant in the contract. Who's going to decide that? If there is a disagreement, which I actually don't think there is, I think ultimately once we get an independent third party, there's only really one way to look at this. But let's just assume that there is. If that occurs, then the contracts themselves have a very specific dispute resolution process that we can get to. But I don't think the court needs to go anywhere near that at this point. Further questions? Thank you. Thank you. Thank you both for your arguments. It was very submitted for decision. We'll be in recess for the morning.
judges: Thomas, Friedland, Zilly